IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bell Socialization Services, Inc.,    :
                 Petitioner    :
                                :
        v.                       :
                                :
Unemployment Compensation    :
Board of Review,              :   No. 747 C.D. 2015
            Respondent    :   Submitted: September 11, 2015

BEFORE:   HONORABLE BERNARD L. McGINLEY, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE McGINLEY               FILED: November 17, 2015

Bell Socialization Services, Inc. (Employer) petitions for review of the Order of the Unemployment Compensation Board of Review (Board) which affirmed the Referee's grant of benefits to Tiffany M. Smith (Claimant) after finding that Claimant's conduct did not rise to the level of willful misconduct under Section 402(e) of the Unemployment Compensation Law (Law).[1]

The facts, as originally found by the Referee and incorporated by the Board, are as follows:

> 1. The claimant was employed from August 5, 2010 until September 27, 2014, at Bell Socialization Services [Employer] as a full-time Senior Residential Service Worker, earning $10.18 per hour.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(e).

2. The employer has policies, of which the claimant was aware, in which an employee who violates the rights of a resident's care or an employee who engages in negligence, mistreatment or insensitivity to the needs of a client will be subject to disciplinary action up to and including termination.

3. As part of the claimant's job responsibilities, she was required to take residents on outings.

4. The claimant's son plays football, and she spoke to the residents for several weeks about attending her son's football game on September 27, 2014.

5. On September 27, 2014, the claimant was on duty with a co-worker, where residents Josh and Charles lived.

6. On September 27, 2014, the claimant asked Charles if he wanted to go to the football game. Charles did not say anything, he got dressed and went into the van.

7. The other resident, Josh, got into the claimant's car.

8. The claimant asked Charles a second time if he wanted to go to the football game. Charles said nothing.

9. The claimant instructed her co-worker to take Charles to the football game in the company van if Charles wanted to go to the football game.

10. A third co-worker, an LPN, spoke to Charles who appeared to be upset because he did not want to go to the football game. The LPN asked Charles about going to the football game, but Charles remained in the van and did not exit it.

11. The claimant's co-worker transported Charles to the football game.

12. The claimant did not force Charles to go to the football game.

2

13.  On September 27, 2014, Charles' girlfriend arrived at the facility at approximately 9:00 a.m.

14.  Charles and his girlfriend asked the claimant if it was okay if they 'made out.'

15.  The claimant said it was okay, but they could not have sex because Charles knew that he had to be tested and had to purchase condoms.

16.  The claimant noticed a large mark on Charles' girlfriend's neck.  The claimant advised his girlfriend that she would be speaking to the girl's father.

17.  After the claimant's co-worker also arrived, Charles' girlfriend told the claimant and her co-worker that she wanted to have sex with Charles.

18.  Charles' girlfriend pointed to her body and referred to both vaginal and anal sex.

19.  The claimant asked a clarifying question to the girlfriend and informed her that the claimant would not allow someone to do that to the claimant.

20.  There were no other residents involved in the conversation between the claimant, the co-worker, Charles and his girlfriend.

21.  On November 10, 2014, the claimant was discharged for allegedly violating Charles' rights when she allegedly took him to an activity in which he did not want to participate and for engaging in a conversation regarding sexual activity, which violated the policy regarding negligence, mistreatment or insensitivity to the needs of a resident.
….
REASONING:...
….
The claimant was discharged for allegedly violating the rights of a resident's care and for alleged negligence, mistreatment or insensitivity to the resident.  The claimant worked in a group home where a resident,

3

Charles, resided. The claimant had spoken to the residents of the home about going to her son's football game on September 27, 2014. On the day of the game, the claimant asked Charles on two separate occasions whether he wanted to go to the game. On his own, Charles got dressed and went into the employer's van. Charles informed an LPN that he did not want to go to the football game but he did not exit the van when he had the opportunity to do so. The claimant drove her own her own car with the other resident while her co-worker drove Charles in the employer's van.

The second incident occurred the same day when the claimant answered questions raised by Charles' girlfriend in regard to sexual activity. Charles' girlfriend informed the claimant that she wanted to have sex with Charles, both anally and vaginally. The claimant asked some clarifying questions and advised the girlfriend that the claimant, personally, would not allow anyone to do that to the claimant. The claimant also advised Charles's girlfriend that she could not have sex with Charles until he was tested and purchased condoms.
….
There is no competent evidence in the record to show that Charles was forced to go to a football game against his will. In fact, the employer's witness testified that she asked Charles if he wanted to go to the game but he did not exit the van when he had the opportunity to do so. In fact, the claimant did not actually transport Charles to the game. A co-worker did in the employer's van. Charles had the opportunity to stay behind, but he chose not to do so for whatever reason. The employer has failed to meet its burden on this point.

In regard to the second incident where the claimant engaged in a conversation regarding sexual activity, the employer also fails to meet its burden. Legitimate concerns were raised in front of the claimant regarding sexual activity between Charles and his girlfriend. The claimant acted responsibly and answered the questions and cautioned the pair against engaging in such activity until Charles was tested and had to [sic] opportunity to purchase condoms. There is no competent evidence in

4

the record to show that the claimant was insensitive or engaged in any type of negligence or mistreatment of Charles or his girlfriend. The claimant's actions do not rise to the level of willful misconduct in this case. Accordingly, benefits are granted.

Referee's Decision, February 3, 2015, (Decision), Findings of Fact (F.F.) Nos. 1-21 and Reasoning at 1-21; Reproduced Record (R.R.) at 71a-73a.

The Board affirmed.

On appeal, Employer contends that the Board erred when it concluded that Claimant did not commit willful misconduct.[2]

Whether a claimant's conduct rises to the level of willful misconduct is a question of law subject to this Court's review. *Lee Hospital v. Unemployment Compensation Board of Review*, 589 A.2d 297 (Pa. Cmwlth. 1991). Willful misconduct is defined as conduct that represents a wanton and willful disregard of standards of behavior which an employer can rightfully expect from the employee, or negligence which manifests culpability, wrongful intent, evil design, or intentional and substantial disregard for the employer's interest or employee's duties and obligations. *Frick v. Unemployment Compensation Board of Review*, 375 A.2d 879 (Pa. Cmwlth. 1977). The employer bears the burden of proving that it discharged an employee for willful misconduct. *City of Beaver Falls v.*

_____

[2] This Court's review in an unemployment compensation case is limited to a determination of whether constitutional rights were violated, errors of law were committed, or findings of fact were not supported by substantial evidence. *Lee Hospital v. Unemployment Compensation Board of Review*, 637 A.2d 695 (Pa. Cmwlth. 1994).

5

*Unemployment Compensation Board of Review*, 441 A.2d 510 (Pa. Cmwlth. 1982). The employer bears the burden of proving the existence of the work rule and its violation. Once the employer establishes that, the burden then shifts to the claimant to prove that the violation was for good cause. *Park v. Unemployment Compensation Board of Review*, 501 A.2d 1383 (Pa. 1985).

In the present case, Employer argues that Claimant was terminated for willful misconduct because Claimant violated Employer's policy which prohibited employees from engaging in negligence, mistreatment, and/or insensitivity to the needs of Employer's residents.[3]

Britta Schwab (Ms. Schwab), human resources coordinator for Employer, testified that Claimant was terminated because she did not respect Charles' confidentiality when she engaged in conversations regarding his sexual activity in front of two other individuals. Notes of Testimony, January 7, 2015, (N.T.) at 7. Ms. Schwab noted that Claimant received a manual which outlined Employer's policies and procedures and Claimant underwent yearly training for her position. N.T. at 8. Ms. Schwab explained that if a resident initiated a conversation of a private or sexual nature, Claimant should have "redirected the conversation and to take it to a more private place." N.T. at 9-10.

Pattie Reese (Ms. Reese), incident manager and program coordinator for Employer, provided annual training to Claimant for incident management,

---

[3] Before this Court, Employer does not challenge the Board's determination that Claimant did not commit willful misconduct regarding Charles' attendance at the football game.

6

client sensitivity, rights violations, misuse of funds, and other incidents. N.T. at 11. Ms. Reese's investigation revealed that Claimant had a conversation of a sexual nature with Charles "in the living room." N.T. at 13. Claimant was trained to answer resident questions but that it should be done "privately" and that "personal experiences" should not be discussed. N.T. at 13-14.

Claimant testified that she did not violate Charles' confidentiality when she engaged in conversations regarding his sexual activity. Claimant explained that the doors to the house were always locked and that only five people were in the house at the time the conversation occurred- four of whom were involved in the conversation. Another resident was in the house but in his room. N.T. at 23. Claimant clarified:

> Me, Sheri Lynn [phonetic], which is Charles' girlfriend, and Charles. Josh [another resident] was there, but he was in his room. There was no other staff in there….They [Charles and Sheri Lynn] asked me if they could go make out, and I told them it was okay for them to make out, that they couldn't have sex….we have a protocol that we had to do. If he wanted to do anything with her, anything intimate, he had to go get checked. She had to go get checked, and he needed to provide some protection…They proceeded to make out. She came out of the sun room, and she had this big old huge suck mark on her neck that looked like he could've put his hands on her….So I got nervous because her dad was upset when he found out that they made out the first time….Darnell came in about 12:00. We all sat in the living room. We all conversated [sic].
> ….
> We were talking about love, relationships, and sex….Charles' girlfriend proceeded to say that she wanted to have sex today….And then she was like- - she pointed- - she was like I like it here and here, and I asked her did you - - are you saying you like anal sex? And she

7

said yes. And I said okay. I said I don't personally myself I don't like that. I wouldn't let nobody [sic] do that to me.

N.T. at 21-22.

Claimant admitted that she asked Sheri Lynn to clarify "what she was talking about" when Sheri Lynn pointed to her body. N.T. at 23. Claimant testified that Sheri Lynn "asked do I like to have sex." N.T. at 24. When asked if Claimant thought it was proper to "talk about whether you would or wouldn't have anal sex in front of Charles and Darnell" with another resident on the premises, Claimant responded, "If she asked me a question and I'm answering her, yes." N.T. at 23. Claimant testified that during her training she was never told that she could not talk about her "own sexual ideas or thoughts with individuals." N.T. at 23.

The Board adopted the Referee's reasoning that:

Legitimate concerns were raised in front of the claimant regarding sexual activity between Charles and his girlfriend. The claimant acted responsibly and answered the questions and cautioned the pair against engaging in such activity until Charles was tested and had to [sic] opportunity to purchase condoms. There is no competent evidence in the record to show that the claimant was insensitive or engaged in any type of negligence or mistreatment of Charles or his girlfriend.

Decision at 3.

In unemployment compensation proceedings, the Board is the ultimate fact-finding body empowered to resolve conflicts in evidence, to determine the credibility of witnesses, and to determine the weight to be accorded

8

evidence. *Unemployment Compensation Board of Review v. Wright*, 347 A.2d 328 (Pa. Cmwlth. 1975). Findings of fact are conclusive upon review provided that the record, taken as a whole, provides substantial evidence to support the findings. *Taylor v. Unemployment Compensation Board of Review*, 378 A.2d 829 (Pa. 1977). Claimant's testimony provided support for the challenged findings.

It was Employer's burden to prove it had a policy or rule, that Claimant was aware of the rule, and that Claimant violated that rule. Employer failed to establish that Claimant was aware of a policy which prohibited her from talking about her own sexual thoughts or ideas based on Claimant's credible testimony.

With respect to Employer's argument that Claimant committed willful misconduct when she talked with Charles and his girlfriend in Employer's common area, Claimant credibly testified that the conversation involved only herself, Charles, Sheri Lynn, and Darnell Brown. No one else was present. Even if Employer's policy required Claimant to address such issues in a private setting, this Court does not view the setting as insufficiently private given that few people were there and the doors to the residence were locked.

Accordingly, the decision of the Board is affirmed.

_____
BERNARD L. McGINLEY, Judge

9

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bell Socialization Services, Inc.,       :
                 Petitioner       :
                     :
         v.             :
                     :
Unemployment Compensation       :
Board of Review,               :    No. 747 C.D. 2015
                 Respondent       :

# **O R D E R**

AND NOW, this 17th day of November, 2015, the Order of the Unemployment Compensation Board of Review in the above-captioned matter is affirmed.

_____
BERNARD L. McGINLEY, Judge